## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IDAS RESOURCES N.V., CURACO; PABECO, B.V.; and ADASTRA MINERALS, INC., f/k/a AMERICAN MINERAL FIELDS, INC. Plaintiffs, § § § § § § v. § § EMPRESSA NACIONAL DE DIAMANTES DE § ANGOLA E.P. and NOFAR MINING B.V. § Defendants. § § | Case No. 1:06-cv-00570-ESH |

§
§
§
§
§
§
§
§
§
§
§
§

IDAS RESOURCES N.V., CURACO; PABECO,
B.V.; and ADASTRA MINERALS, INC., f/k/a
AMERICAN MINERAL FIELDS, INC.
Plaintiffs,

v.                                          Case No. 1:06-cv-00570-ESH

EMPRESSA NACIONAL DE DIAMANTES DE
ANGOLA E.P. and NOFAR MINING B.V.
Defendants.

## PLAINTIFFS' RESPONSE TO DEFENDANT ENDIAMA'S MOTION TO DISMISS, OBJECTIONS TO THE SUPPORTING AFFIDAVIT OF MANUEL ARNALDO DE SOUZA CALADO, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

COME NOW, Plaintiffs IDAS Resources N.V., Curaco ("IDAS"); Pabeco B.V.; and Adastra

Minerals, Inc., f/k/a America Mineral Fields, Inc. ("Plaintiffs") and file this Response to Defendant

Empressa Nacional de Diamantes de Angola E.P.'s ("ENDIAMA") Motion to Dismiss for lack of

subject matter jurisdiction and would show the Court as follows:

## I.
### INTRODUCTION

This action arises out of a series of agreements amongst Plaintiff IDAS, Defendant

ENDIAMA, and Twins Limited, executed in 2002 and 2003 ("the 2002-2003 Agreements").

ENDIAMA is an instrumentality of the Angolan Government. The Foreign Sovereign

Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA") provides the exclusive basis for

exercising jurisdiction over a foreign sovereign, as well as its agencies and instrumentalities. *See*

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-39 (1989); *see also Saudi*

*Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *TMR Energy LTD. v. St. Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005). Jurisdiction over ENDIAMA is based upon two FSIA subsections, 28 U.S.C. § 1605(a)(2) and 28 U.S.C. § 1605(a)(3).

Section 1605(a)(2) provides jurisdiction in any case in which the action is:

1. based upon an act outside the territory of the United States,

2. in connection with a commercial activity of the foreign state elsewhere, and

3. that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). ENDIAMA concedes that this action is based upon an act outside the territory of the United States, in connection with a commercial activity of ENDIAMA elsewhere. *See Defendant ENDIAMA's Memorandum in Support* at 4, n.1 (stating "ENDIAMA is not disputing that the nature of its Angolan activities are commercial"). ENDIAMA asserts, however, that its conduct made the basis of this action did not cause a "direct effect in the United States." This assertion is without merit.

Section 1605(a)(3) provides subject matter jurisdiction in any case in which

1. rights in property taken in violation of international law are in issue,

2. that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state, and

3. that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). ENDIAMA denies that rights in property were taken in violation of international law and that ENDIAMA is now or ever has been engaged in any commercial activity in the United States.[1] These contentions, too, are without merit.

---

[1]     ENDIAMA concedes that it owns or operates the property in issue. *See* Exhibit A to "*ENDIAMA's Memorandum in Support*, Affidavit of Manuel de Sousa Calado, President of

## II.

### ARGUMENT AND AUTHORITIES

**A.     Burden of Proof**

"In accordance with the restrictive view of sovereign immunity reflected in the FSIA," the defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity. *Transamerican S.S. Corp. v. Somali Democratic Republic*, 767 F.2d 998, 1002 (D.C. Cir. 1985); *see also Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Princz v. Federal Republic of Germany*, 16 F.3d 1166, 1171 (D.C. Cir. 1994). In carrying this burden, the defendant may challenge the legal sufficiency or the factual basis of an exception, or both. *Phoenix Consulting, Inc.*, 216 F.3d at 40.

If the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations, the district court "should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix*, 216 F.3d at 40. If the defendant challenges the factual allegations forming the basis for jurisdiction, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss."[2] *Id*.

**B.     28 U.S.C. § 1605(a)(2) - Direct Effect**

Defendant ENDIAMA challenges this Honorable Court's exercise of 28 U.S.C. § 1605(a)(2) subject matter jurisdiction on both factual and legal grounds. The factual centerpiece of ENDIAMA

---

ENDIAMA's Board of Directors at ¶ 6 (hereinafter "*Calado Affidavit* at ¶ ___").

[2]     Although the district court has wide discretion in deciding the extent to which the plaintiff will be allowed to undertake discovery to establish jurisdiction, the court should give the plaintiff "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Prakash v. American University*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984).

attack is the Calado Affidavit. The legal centerpiece of the attack is the Supreme Court's decision

in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992). In response to ENDIAMA's

argument, Plaintiffs respectfully urge this Court to consider in the first instance the thoughts of John

Trumbull, another jurist, and colleague of John Adams:

> *But as some muskets so contrive it*
> *As oft to miss the mark they drive at,*
> *And though well aimed at duck or plover,*
> *Bear wide, and kick their owners over.*

*McFingal*, John Trumbull (1775). ENDIAMA's musket misses the mark.

## 1.    ENDIAMA's Factual Attack: The Calado Affidavit

Defendant ENDIAMA relies exclusively upon the Affidavit of Manuel Arnaldo de Souza

Calado ("Calado Affidavit") in support of its argument that this Court is without subject matter

jurisdiction. Plaintiffs object to the Calado Affidavit and move that it be struck.

### a.    Objections to the Entirety of the Affidavit of Manuel Arnaldo de Souza Calado

First, the Calado Affidavit is not accompanied by a certified translation.[3] Testimony

translated from a foreign language must be authenticated and any interpretation must be shown to

be accurate and performed by a competent translator. *See, e.g., Fresnius Medical Care Holdikngs*

*v. Baxter Int'l*, 2006 Loislaw, No. C 03-1431 SBA, [Docket No. 498] (May 15, 2006); *Jack v. Trans*

*World Airlines*, 854 F. Supp. 654, 659 (N.D. Cal. 1994) (excluding foreign language affidavits due

to translator's failure to properly certify the translation); *Kesel v. United States Parcel Service, Inc.*,

2002 WL 102606 at * 3 (N.D. Cal. 2002); *see also* FED. R. EVID. 604 and 901.

Second, the seal purporting to be that of a notary is not translated at all. ENDIAMA has not

---

[3]    The Calado Affidavit was apparently delivered to counsel for ENDIAMA by
telefax - the translation obviously was not.

demonstrated that the person purporting to notarize the document is: "(1) A notary public or notary; (2) A judge, clerk, or deputy clerk of a court of record; or (3) Any other person authorized by the law of that jurisdiction to perform notarial acts." D.C. Code § 42-146(a).  Nor has ENDIAMA satisfied any of the other D.C. Code alternative methods for the notarization of a foreign document.

Third, the Calado Affidavit is hearsay, and ENDIAMA undertakes no effort to establish an exception to the hearsay rule. *See* Fed. R. Evid. 803.

Fourth, the Calado Affidavit is not authenticated under either FED. R. EVID. 901 or 902(3)(foreign public documents), 902(8)(acknowledged documents), or 902(12)(certified foreign records of regularly conducted activity).

Fifth, Mr. Calado does not aver that he has personal knowledge of any of the facts set forth in his affidavit, nor does he aver that the facts set forth are true and correct. Because ENDIAMA has filed the Calado Affidavit in support of its Motion to Dismiss, ENDIAMA's Motion to Dismiss is treated as a motion for summary judgment. *See Brookens v. United States*, 627 F.2d 494, 499 (D.C. Cir. 1980); *Scanwell Laboratories, Inc. v. Thomas*, 521 F.2d 941, 949 (D.C. Cir. 1975). An affidavit filed in support of a motion for summary judgment must be shown to be based upon personal knowledge. *See* FED. R. CIV. P. 56(e); *Gleklen v. Democratic Congrssional Camp*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).

For the foregoing reasons, Plaintiffs move the Court strike the Calado Affidavit in its entirety.  In the event the Court determines not to strike the Calado Affidavit, Plaintiffs address below the specific paragraphs in the Calado Affidavit. Simply stated, every statement in the Calado Affidavit is irrelevant, objectively false, or conclusory.

### b.    Paragraphs 1-13 - Curious Irrelevancies

Paragraphs 1-7 of the Calado Affidavit provide background information on ENDIAMA. Paragraphs 8-13 discuss in some detail a June 14, 1995, contract between ENDIAMA and IDAS ("the 1995 Agreement").[4]  The 1995 Agreement is also the focus of ENDIAMA's Motion to Dismiss. Indeed, ENDIAMA avers in its Motion to Dismiss that "[t]he contracts entered into between IDAS and ENDIAMA ('IDAS Agreement') involved prospecting and exploration only in Angola," and supports this statement by referring to paragraph 8 of the Calado Affidavit. *ENDIAMA's Memorandum in Support* at 3.  Paragraph 8 of the Calado Affidavit states that "[t]he June 14, 1995 contract entered into between ENDIAMA and IDAS ('IDAS Agreement') involved prospecting and exploration only in Angola."

It is clear from the Calado Affidavit, and the Motion to Dismiss, that ENDIAMA's jurisdictional attack is based upon the 1995 Agreement. The problem with ENDIAMA's argument, and Mr. Calado's preoccupation with the 1995 Agreement, is that the 1995 Agreement is irrelevant to the claims being made - as it was rescinded in 2000 by mutual agreement of the parties. **The claims being made by Plaintiffs arise out of the 2002-2003 Agreements,**[5] agreements which

---

[4]     According to Mr. Calado, the 1995 Agreement involved exploration and prospecting; was governed by Angolan law, with Portuguese to be the official language for all matters related to the agreement; required binding arbitration of all disputes in Luanda, Angola; did not involve contract negotiations in the United States; and was not to be performed in the United States. *See Calado Affidavit* at ¶¶ 8-13.

[5]     Because of a new law limiting the maximum area that could be licensed to a single entity, the 1995 Agreement was rescinded by agreement of the parties. Rescission was memorialized in a November 2000, Memorandum of Understanding, ratified by the Council of Ministers, and published in *The Diario*, the official Government gazette. As noted in the Complaint,

The Angolan Government promulgated a new diamond law limiting the maximum diamond concession area for any one company to 3,000 sq. km. Based upon this fact,

ENDIAMA wholly fails to address in its Motion to Dismiss, Memorandum in Support, and Calado Affidavit. Accordingly, Mr. Calado's discussion of the 1995 Agreement is utterly without probative force in support of ENDIAMA's burden to establish an exception to the FSIA.[6]

      **c.**     **Paragraphs 14-17**

Paragraphs 14 and 15 of the Calado Affidavit aver that ENDIAMA has no employees in the United States, is not a resident of the United States, and has no offices in the United States. But these paragraphs say nothing about whether the actions complained of had a "direct affect" in the United States. Accordingly, these paragraphs are of no help to ENDIAMA either.

In paragraph 16 of his affidavit, Mr. Calado swears that "ENDIAMA does not and has not engaged in any course of conduct in the United States" and that "ENDIAMA has never been involved in any transactions or business with any entity located in the United States." *Calado Affidavit* at ¶ 16; *see also* ¶ 17 (stating the same). These statements are demonstrably false.

First, the 2002-2003 Agreements were amongst Twins **(based in Washington, D.C.)**, IDAS, and ENDIAMA. And ENDIAMA's active and significant contacts with other U.S.-based entities date back at least a decade.

> IDAS and Twins were advised by ENDIAMA that the 1995 and related agreements were no longer effective and new contracts would have to be agreed. **IDAS and Twins agreed to terminate the earlier agreements and negotiate new contracts with ENDIAMA.**

*Complaint* at ¶ 17 (emphasis added).

---

    [6]     Because of Mr. Calado's active involvement and knowledge of the contracts and relations made the basis of this suit, Mr. Calado's mistake in relying on the 1995 Agreement is highly dubious. And in fact, from 1996 to 1999, IDAS maintained an office in Washington, D.C. for purposes of assisting in the management of the 1995 Agreement. This office regularly exchanged communications with Twins in Washington, D.C. and ENDIAMA in Angola regarding the 1995 Agreement and activities related to developing the concessions which were the subjects of the 1995 Agreement.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT EMPRESSA NACIONAL**
**DE DIAMANTES DE ANGOLA E.P.'S MOTION TO DISMISS**          7

For example, in December of 1994, ENDIAMA signed a five year agreement with Lazare Kaplan International Inc. ("LKI"), a Delaware corporation with its principal place of business in New York, for the purchase and export of diamonds from Angola. According to LKI's SEC filings:

> In December 1994, the Company reached an agreement with the Empresa Nacional de Diamantes de Angola ("Endiama"), Angola's national diamond mining company, pursuant to which the Company was granted a license to purchase rough diamonds from local Angolan miners and export such rough diamonds for resale. At the time, this was one of three such licenses granted by Endiama. The Company believes that, since this time, Endiama has issued two additional licenses. The agreement entitles the Company to establish buying offices throughout Angola, the first of which was set up during 1995 in Luanda, the capital of Angola. The Company currently has five buying offices located in Angola, including the office in Luanda. The agreement has a term of five years ending on December 31, 1999. The Company has not yet determined whether or not to seek to renew this agreement. Any renewal will, among other things, be dependent upon stability in Angola, market conditions, profitability, if any, of the Company's Angolan operations and the Company's ability to negotiate acceptable terms and conditions.

Exhibit 1, *Lazare Kaplan International, Inc. 1999 10K* at 3-4.[7]

In 2004, LKI announced a new "technical cooperation agreement regarding the marketing of rough diamonds with [Sociedade de Comercializacao de Diamantes de Angola, SARL ('SODIAM')]," a recently formed ENDIAMA subsidiary that took over for ENDIAMA the responsibility for the marketing of diamonds produced in Angola. *See Lazare Kaplan International, Inc. 2004 10K* at 8. This agreement with SODIAM was executed by Mr. Calado himself and provides:

> The capital of SODIAM is subscribed to ENDIAMA, the State Diamond Company of Angola, to which Angolan legislation attributes, in its own name or by way of a company created by it, the exclusive right to market diamonds in Angola.

Exhibit 2, *Lazare Kaplan International, Inc. 2004 10K* at 1.

---

[7]    The agreement further provides that LKI and ENDIAMA would work towards the establishment of a cutting and polishing facility in Angola.

Finally, during the period of 2003 to 2005 alone, ENDIAMA secured the Angolan export of over $110 million dollars worth of rough diamonds to the United States. *See* Exhibit 3, *Disclosure of U.S. Dep't of Commerce*. Therefore, even without the aid of discovery, Plaintiffs can definitively say that Mr. Calado's sworn statements that "ENDIAMA does not and has not engaged in any course of conduct in the United States" and that "ENDIAMA has never been involved in any transactions or business with any entity located in the United States" are false. *Calado Affidavit* at ¶ 16.[8]

     **d.**    **Paragraphs 18-27**

Plaintiffs object to paragraphs 18, 19, and 26 of the Calado Affidavit because they are simply recitals of the holdings that ENDIAMA hopes to elicit from this Honorable Court:

18.    ENDIAMA has not waived, either explicitly or by implication, its jurisdictional immunity from suit in the United States.

19.    ENDIAMA has not performed any act or commercial activity in the United States, or any act outside the territory of the United States in connection with commercial activities that have or had a direct effect in the United States, relating to the facts alleged in this cause of action.[9]

26.    No Agreement entered into by ENDIAMA designated a location in the United States as a place of performance where money was to be paid or other acts performed.[10]

---

[8]    Once again, because of Mr. Calado's active involvement in and knowledge of the LKI contracts and relations, as well as the significant export of diamonds to the United States, Mr. Calado's mistakes as to these matters are highly dubious.

[9]    Those portions of Mr. Calado's Affidavit which relate to an agreement between IDAS and ENDIAMA refer to the 1995 Agreement. It is not clear from the language used by Mr. Calado whether this paragraph refers to the facts surrounding the 1995 Agreement or the facts related to the 2002-2003 Agreements.

[10]    Public records reveal that ENDIAMA and, later SODIAM, an entity formed by ENDIAMA for purposes of marketing, entered into at least two (2) contracts with New York based LKI. These contracts involved significant logistical planning, financial support, and

Conclusory allegations contained in an affidavit are of no probative force. *See e.g., Consolidated Edison Co. of New York v. Bodman*, 445 F.3d 438, 458 (D.C. Cir. 2006); *Maydack v. U.S. Dep't of Justice*, 218 F.3d 760, 769 (D.C. Cir. 2000).

Paragraphs 21-25 also fail to provide any probative evidence; they relate solely to ENDIAMA's contractual relations with NOFAR, not the Plaintiffs, and are therefore irrelevant to the jurisdictional analysis presently being considered by the Court. Finally, the last of Mr. Calado's statements, paragraph 27, is uninformed.

Mr. Calado asserts that "ENDIAMA had no involvement with Adestra [sic] Minerals, Inc.'s ('AMI') purchase of IDAS." *Calado Affidavit* at ¶ 27. In a February 23, 1998, meeting, however, ENDIAMA expressly consented to Plaintiff Adastra's acquisition of IDAS. *See* Exhibit 4, *Correspondence Between Parties*. This consent was subsequently confirmed in writings exchanged between the parties, one which includes an invitation for ENDIAMA "to come to Dallas or any other place in the US, at any time convenient to you, to meet the Chairman of AMF as well as some of the members of the Board of Directors of IDAS Resources N.V. and AMF." *Id*. at 3. As with his other sworn statements, Mr. Calado's statement that ENDIAMA had no involvement in Adastra's acquisition of IDAS is incorrect.[11]

### 2.   **ENDIAMA's Legal Attack:** *Republic of Argentina v. Weltover, Inc.*

ENDIAMA also asserts that its activities made the basis of Plaintiffs' claims did not have

---

income of millions of dollars to LKI. It is most unlikely that these contracts did not involve significant activities in New York, and elsewhere in the United States. Plaintiffs cannot, however, fully develop these facts without the aid of discovery.

[11]   Yet again, because of Mr. Calado's active involvement in and knowledge of the contracts and relations made the subject of this litigation, Mr. Calado's mistakes as to these matters are highly dubious.

a "direct effect in the United States." *See* 28 U.S.C. § 1605(a)(2). The centerpiece of ENDIAMA's

argument is the Supreme Court's decision in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607

(1992). According to ENDIAMA,

> The Supreme Court, in <u>Weltover</u>, defined a "direct effect" as one that "follows as an immediate consequence of the defendant's activity." 504 U.S. at 607 (internal citations and quotes omitted). The Court stated that "[p]urely trivial effects in the United States" are not sufficient and § 1605(a)(2) requires that such effects be substantial or foreseeable. <u>Weltover</u>, 504 U.S. at 618.

*ENDIAMA's Memorandum in Support* at 6. This argument is premised upon a fatal error in legal

research - the Supreme Court's holding in *Weltover* was exactly the opposite of what ENDIAMA

represented it to be.  Neither the court of appeals nor the Supreme Court concluded that a direct

effect had to be substantial or foreseeable to satisfy the requirements of § 1605(a)(2). To the

contrary, the Supreme Court stated, **"we reject the suggestion that § 1605(a)(2) contains any**

**unexpressed requirement of 'substantiality' or 'foreseeability.'"** *Weltover*, 504 U.S. at 618

(emphasis added).

   How ENDIAMA came to its interpretation of *Weltover* is a mystery, but the motivation

behind the interpretation is obvious. ENDIAMA has undertaken to heighten the standard to be used

in this case because the direct effects of the case satisfy the actual standard. While it is true that

"purely trivial effects in the United States" are insufficient to constitute a "direct effect in the United

States," the direct effects of this action are far from trivial. *Id*. at 618; 28 U.S.C. § 1605(a)(2).

   a.    **U.S. Bank Accounts**

   As an initial matter, it is essential to once again note that the agreements made the basis of

this action were amongst **Twins (based in Washington, D.C.)**, IDAS (based in London), and

ENDIAMA (based in Angola).

An effect is "direct" if it is not trivial and follows "as an immediate consequence" of the defendant's activity. *Weltover*, 504 U.S. at 618. A direct effect can arise from a breach of contract as well as from a tort, and the act in question need not occur in the United States, so long as it has a direct effect here. For example, a deposit or required future deposit in a U.S. bank account constitutes a direct effect in the United States, regardless of whether the parties considered the place of payment "important," "critical," or "integral." *Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1186 (D.C. Cir. 2003); *see also Keller v. Central Bank of Nigeria*, 277 F.3d 811 (6th Cir. 2002); *Reed Intern. Trading Corp. v. Donau Bank AG*, 866 F. Supp. 750 (S.D. N.Y. 1994). This standard is clearly satisfied in this case.

Twins began assisting IDAS with its work with ENDIAMA during the period of the effective dates of the 1995 Agreement and received compensation for this work from IDAS. *See* Exhibits 5 and 6. Twins was not, however, a party to the 1995 Agreement.

When ENDIAMA and IDAS rescinded the 1995 Agreement, Twins was invited to become a party to the 2002-2003 Agreements, and a shareholder and active participant in the management of the company to be formed with IDAS and ENDIAMA to undertake the exploration and exploitation of the property subject to those agreements.

Once Twins became a joint venture partner, it received reimbursement for expenses incurred. *See* Exhibit 7. Additionally, as a partner, Twins was to be compensated with 13 percent of the profits of the company subsequent to capital recoupment. *See* Exhibit 8, *Pryor Declaration* at ¶ 4. Payments to Twins under the 1995 Agreement and the 2002-2003 Agreements were made to bank accounts in Washington, D.C.

While Twins is a partnership formed under the laws of the Cook Islands, Washington, D.C.

has at all times been Twins' principal place of business. *See* Exhibit 8, *Pryor Declaration* at ¶¶ 6-10. Twins is comprised of two principals, former State Department official Robert Cabelly and former Angolan Ambassador to the United States General Ndalu. *Id.* at ¶ 6. Both Robert Cabelly and General Ndalu maintain their places of residence in Washington, D.C., and Robert Cabelly is also the founder and managing director of C/R International LLC, a Washington, D.C. public relations and lobbying firm that represents the Republic of Angola. *Id.* at ¶ 6.

From 1998 to 2004, IDAS' contact with Twins on matters related to the 1995 Agreement, and then the 2002-2003 Agreements, were either Robert Cabelly or General Ndalu, in Washington, D.C. *Pryor Declaration* at ¶ 7. This course of dealings was continuous and systematic and included regular telephone conversations and exchanges of correspondence with Robert Cabelly at his Washington, D.C. office, as well as telephone conversations and exchanges of correspondence relating to the 2002-2003 Agreements with General Ndalu in Washington, D.C. This correspondence included communications amongst IDAS in London, Robert Cabelly and General Ndalu in Washington, D.C., and ENDIAMA representatives in Luanda, Angola. *Id.*

Representatives of the Plaintiffs had at least two meetings in the United States with Twins specifically to discuss the 2002-2003 Agreements. *See* Exhibit 8, *Pryor Declaration* at ¶ 10. For example, representatives of the Plaintiffs traveled to the United States in or about 2003 to meet with Robert Cabelly in Washington, D.C. and also traveled to the United States on a separate occasion to meet with General Ndalu at General Ndalu's Washington, D.C. home. *Id.*

Payments made to Twins under the 2002-2003 Agreements (and the 1995 Agreement before that), were made to designated bank accounts in the United States. *Pryor Declaration* at ¶¶ 8-9. One of the accounts was held by Robert Cabelly personally in Washington, D.C. and maintained by

NationsBank NA. See Exhibit 5, *Invoice and Receipt* at 2. The second account was held by C/R International LLC in Washington, D.C. and maintained by First Union Bank. See Exhibit 7, *Invoice and Receipt* at 1, 6. Indisputably, payments made and to be made to a U.S. bank account are sufficient to constitute a direct effect in the United States pursuant to the FSIA. *See, e.g., Walpex Trading Co. v. Yacimientos Petroliferos Fiscales Bolivianos*, 712 F. Supp. 383, 389 (S.D.N.Y. 1989) (finding a "direct effect" where a foreign buyer utilized U.S. banking resources to facilitate a payment); *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 188-91 (D.C. Cir. 2003); *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 815-17 (6th Cir. 2002); *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 130-33 (2d Cir. 1998). As a direct result of ENDIAMA's acts made the basis of this litigation, deposits were no longer made to Twins' U.S. bank accounts. Therefore, ENDIAMA's actions caused a "direct effect in the United States," as required by 28 U.S.C. § 1605(a)(2). And through the date of ENDIAMA's unilateral repudiation of the 2002-2003 Agreements, Twins had not notified IDAS that future payments to Twins were to be made anyplace other than Washington, D.C.

### b.    *Economic Damage*

Although speculative financial loss by a distant U.S. person or entity may not, in itself, be sufficient to constitute a "direct effect in the United States," a claim of economic damage to a U.S. person or entity is brought under the "direct effect" clause if such injury follows as an immediate consequence of the defendant's activity and is not simply the result of the ripples caused by an overseas transaction eventually reaching the shores of the United States. *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 239-41 (2d Cir. 2002); *United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n*, 33 F.3d 1232, 1237-39 (10th Cir. 1994); *Voest-Alpine*

*Trading USA Corp. v. Bank of China*, 142 F.3d 887, 897 (5th Cir. 1998) (holding that a financial loss incurred in the United States that "is an immediate consequence of the defendant's activity, constitutes a direct effect sufficient to support jurisdiction under the third clause of the commercial activity exception to the FSIA"). Because the loss here was not merely the result of ripples caused by distant transactions, the "direct effects" requirement is satisfied, and this remains the case despite the fact that Plaintiffs are all foreign corporations. *Weltover*, 504 U.S. at 608 (holding that the "suggestion that the 'direct effect' requirement cannot be satisfied where the plaintiffs are all foreign corporations with no other connections to this country is untenable").

Plaintiffs allege in paragraph 27 of their Complaint that "[t]he actions of ENDIAMA set forth herein have caused a direct effect in the United States, including a loss of income to the principals in Twins, which, together with IDAS, was ENDIAMA's joint venture partner, as well as losses to the United States shareholders of AMI, IDAS's parent." ENDIAMA does not challenge these facts. Rather, it urges that even if true, these facts do not suffice to vest jurisdiction under the FSIA. Accordingly, this Honorable Court must take these allegations as "true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix*, 216 F.3d at 40. They do. The active ongoing participation of Twins in the negotiation and execution of the 2002-2003 Agreements, payments made to Twins for its work on those agreements, and the fact that future payments to Twins for expense reimbursement, services, and profit distribution would be made in Washington, D.C., clearly satisfy the direct effects requirement.

### c.    *Concluding Remarks Regarding Direct Effects Analysis*

In sum, this Honorable Court can exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(2) because this action is: (1) based upon an act outside the territory of the United States,

(2) in connection with a commercial activity of the foreign state elsewhere, and (3) that act causes a direct effect in the United States. ENDIAMA sole contention to the contrary is that its acts did not cause a direct effect in the United States. In an attempt to substantiate its contention, ENDIAMA grossly mischaracterized the applicable standard, purporting that in *Weltover* the Supreme Court held that direct effects must be substantial and foreseeable. Despite this mischaracterization, Plaintiffs have provided a number of different grounds, each being independently sufficient, for this Honorable Court to hold that ENDIAMA's acts caused a direct effect in the United States. Therefore, this Honorable Court may exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(2).

### C.    28 U.S.C. § 1605(a)(3)

In addition to being able to exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(2), this Honorable Court may also exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1605(a)(3). This is so because (1) rights in property taken in violation of international law are in issue, (2) that property is owned by an agency or instrumentality of the foreign state, and (3) that agency or instrumentality is engaged in a commercial activity in the United States. ENDIAMA, however, denies that rights in property taken in violation of international law are in issue and that ENDIAMA is now or ever has been engaged in any commercial activity in the United States.[12]

### 1.    Violation of International Law

The exception of 28 U.S.C.A. § 1605(a)(3) parallels the Hickenlooper Amendment to the act of state doctrine. *See* 22 U.S.C. § 2370(e)(2); *see also De Sanchez v. Banco Central De Nicaragua*, 770 F.2d 1385, 1395-98 (5th Cir. 1985). Like the Hickenlooper Amendment, 28 U.S.C.A. §

---

[12]    ENDIAMA concedes that it owns or operates the property in issue. *Calado Affidavit* at ¶ 6.

1605(a)(3) was intended to subject to U.S. jurisdiction any foreign agency or instrumentality that has expropriated property without compensation. *De Sanchez*, 770 F.2d at 1395-98; *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.)*, 730 F.2d 195 (5th Cir. 1984). Thus, the statutory term, "taken in violation of international law," includes the expropriation of property without payment of the prompt, adequate, and effective compensation required by international law, and the term also includes takings that are discriminatory in nature. House Judiciary Committee Report No. 94-1487 (1976) pp. 19, 20.

To constitute a valid taking under international law that does not fall within the expropriation exception, (1) the expropriation must serve a public purpose, (2) aliens must not be discriminated against or singled out for regulation by the state, and (3) there must be payment of just compensation. *Altmann v. Republic of Austria*, 317 F.3d 954 (9th Cir. 2002), *aff'd*, 541 U.S. 677 (2004). ENDIAMA has not even attempted to claim the applicability of any of these three required elements. On the contrary, none is applicable here. ENDIAMA took Plaintiffs' rights in violation of international law, as Plaintiffs were in no way compensated for ENDIAMA's taking of their licenses and concessions and as ENDIAMA discriminated against Plaintiffs in favor of Defendant NOFAR.

Moreover, while these well-settled rules are within the general principals of international law and embodied in the authorities listed above, these rules have also been memorialized in treaties entered into by Angola. *See e.g.,* TREATY ESTABLISHING COMMON MARKET FOR EASTERN AND SOUTHERN AFRICA ("COMSEA Treaty"), 33 I.L.M. 1067 (1994). For example, Angola is a signatory and "Member State" of the COMSEA Treaty, and that treaty, among others, explicitly provides that private investors, such as Plaintiffs, have the right to "fair and equitable treatment."

*Id.* at art 159(1)(a). The COMSEA Treaty further provides that the Member States accept that international law requires that they refrain from expropriating investors' rights in property, such as the licenses and concessions issued to Plaintiffs, and that if investors' rights are expropriated by a Member State, that Member State must "pay adequate compensation." *Id.* at art 159(3). ENDIAMA's actions are in express violation of the COMSEA Treaty.

For these reasons, it is clear that rights in property taken in violation of international law are in issue.

**2.    ENDIAMA has Engaged in at Least One Commercial Activity in the United States**

Section 1605(a)(3) jurisdiction as applicable here requires that the defendant be "engaged in a commercial activity in the United States." In fact, ENDIAMA has a long history of commercial dealings with U.S. based entities. Indeed, as noted above, the parties to the 2002-2003 Agreements include Twins, based in the U.S.[13]

There was also the 1994 agreement with LKI, a corporation organized under the laws of Delaware with its principal place of business in New York. As noted *supra*, in December of 1994,

---

[13]    It should also be remembered that Adastra acquired IDAS in 1998 because it believed that IDAS' 1995 Agreement with ENDIAMA had significant value. At the time of this acquisition, IDAS had an office in Washington, D.C.; Adastra's Chairman, Bernie Vavala, was a U.S. citizen residing in the United States; IDAS was based in Dallas, Texas; and Adastra had well over 200 U.S. shareholders. *See Pryor Declaration* at ¶ 12-13. Although these activities all post-dated the execution of the 1995 Agreement, they underscore ENDIAMA's interaction with U.S. based entities.

In a meeting held on February 23, 1998, ENDIAMA advised IDAS that it did not object to Adastra's acquisition of IDAS. *See* Exhibit 4, *Correspondence Between Parties* at 2. This was subsequently confirmed in writings exchanged between the parties, one of which includes an invitation for ENDIAMA "to come to Dallas or any other place in the US, at any time convenient to you, to meet the Chairman of AMF as well as some of the members of the Board of Directors of IDAS Resources N.V. and AMF." *Id.* at 3.

---

ENDIAMA signed a five year agreement with LKI for the purchase and export of rough diamonds from Angola. *See* Exhibit 1, *Lazare Kaplan International, Inc. 1999 10K* at 3-4.

Next, there was, in 2004, LKI's "technical cooperation agreement regarding the marketing of rough diamonds with [Sociedade de Comercializacao de Diamantes de Angola, SARL ('SODIAM')]," a recently formed ENDIAMA subsdiary that took over for ENDIAMA the responsibility for the marketing of diamonds produced in Angola. *See Lazare Kaplan International, Inc. 2004 10K* at 8. Moreover, during the period of 2003 to 2005 alone, ENDIAMA secured the Angolan export of over $110 million dollars worth of rough diamonds to the United States. *See* Exhibit 3, *Disclosure of U.S. Dep't of Commerce.*

These activities support a finding that ENDIAMA is and has been "engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

### D.    Limited Discovery Should Be Ordered, If Needed

Plaintiffs believe that they have sufficiently demonstrated herein and in their Complaint that this Honorable Court has subject matter jurisdiction over this action. However, if the Court believes that its inquiry into this matter would be aided by additional evidence, Plaintiffs hereby request that jurisdictional discovery be permitted.

The Court of Appeals for the D.C. Circuit has long held that the district court retains "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," but it must give the plaintiff "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Prakash v. American University*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984). Yet Plaintiffs note that in order to avoid burdening a sovereign that proves to be immune from suit, jurisdictional discovery should be carefully controlled and limited. *See Foremost-*

---

*McKesson,* 905 F.2d at 449. Therefore, if this Honorable Court requires additional evidence from Plaintiffs on this issue, which it should not, Plaintiffs hereby request an opportunity to conduct limited jurisdictional discovery and that a hearing to present such evidence be scheduled.

### III.

### CONCLUSION

Pursuant to the foregoing, Plaintiffs respectfully urge this Honorable Court deny Defendant ENDIAMA's Motion to Dismiss and hold that either 28 U.S.C. § 1605(a)(2) or 28 U.S.C. § 1605(a)(3) of the FSIA provides a sufficient basis for the Court's exercise of subject matter jurisdiction. If necessary, Plaintiffs also hereby request leave to amend the Complaint to include the jurisdictional facts as alleged here.

**Respectfully submitted,**

Steven D. Cundra
Hall Estill Hardwick Golden Gable & Nelson, PC
1120 20th Street, NW
Suite 700, North Building
Washington, DC 20036

Stephen F. Malouf
The Law Offices of Stephen F. Malouf, PC
3811 Turtle Creek Blvd., Suite 1600
Dallas, Texas 75219

**Attorneys for Plaintiffs**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IDAS RESOURCES N.V., CURACO )<br>)<br>PABECO B.V. )<br>)<br>ADASTRA MINERALS, INC. )<br>f/k/a AMERICAN MINERAL FIELDS, INC. )<br>)<br>      Plaintiffs, )<br>)<br>v. )<br>)<br>EMPRESSA NACIONAL DE DIAMANTES )<br>DE ANGOLA E.P. )<br>)<br>NOFAR MINING B.V. )<br>)<br>      Defendants. )<br>) | Case No. 1:06-cv-00570-ESH |

## DECLARATION OF JONATHAN NOCKELS

I, Jonathan Nockels, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct and made pursuant to my personal knowledge:

1.    From August 2005 to the present date, I have served as an assistant to Stephen F. Malouf in his representation of the Plaintiffs in the above listed cause of action.

2.    In Plaintiffs' Response to Defendant ENDIAMA's Motion to Dismiss the following are attached as exhibits:

      a.    Lazare Kaplan's 1999 10K,

      b.    Portions of Lazare Kaplan's 2004 10K,

   c.  U.S. Dep't of Commerce Disclosure Regarding Angolan Diamond Exports,

   d.  Correspondence amongst the Parties Regarding Adastra's Acquisition of IDAS,

   e.  Invoices for Twins' Services,

   f.  Receipts for Payments Made to Twins' U.S. Bank Accounts, and

   g.  Declaration of Bernie Pryor.

   3.   Pursuant to my personal knowledge and belief, these attached exhibits are true and correct and the copies provided are authentic, true and correct copies of the original documents.

Jonathan Nockels: _____     Date: 09/05/06 _____

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served upon the attorneys of record in the above cause in accordance with the Federal Rules of Civil Procedure on this 5ᵗʰ day of September, 2006.

Steven D. Cundra
Hall Estill Hardwick Golden Gable & Nelson, PC
1120 20ᵗʰ Street, NW
Suite 700, North Building
Washington, DC 20036