## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————  )
)
**IDAS RESOURCES N.V., CURACAO;**  )
**PABECO B.V., ADASTRA MINERALS,**  )
**INC. f/k/a AMERICA MINERAL**  )
**FIELDS, INC.**  )
)
       **Plaintiffs,**  )
)
       **v.**  )  **Civil Action No.  06-00570 (ESH)**
)
**EMPRESA NACIONAL DE**  )
**DIAMANTES DE ANGOLA E.P.;**  )
**NOFAR MINING B.V.**  )
)
       **Defendants.**  )
———————————————————  )

## <u>MEMORANDUM OPINION</u>

The dispute in this case arises from contracts to conduct diamond prospecting and mining in Angola.  All of the parties are foreign companies, and one of the defendants, Empresa Nacional de Diamantes de Angola E.P. ("ENDIAMA"), is owned and controlled by the Angolan government.  Given the citizenship of the parties and ENDIAMA's status as an instrumentality of the Angolan government, the only possible basis for this Court's jurisdiction is the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*  Both defendants contend that neither FSIA's "expropriation exception" nor its "commercial activity exception" defeats ENDIAMA's sovereign immunity.  Defendant NOFAR Mining B.V. ("NOFAR") further contends that the Court lacks diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) and personal jurisdiction pursuant to the District of Columbia's long-arm statute.  For the reasons explained herein, the Court will grant defendants' motions to dismiss, will deny plaintiffs' request to conduct jurisdictional discovery, and will dismiss the above-captioned case without prejudice for

lack of subject matter jurisdiction.

## BACKGROUND

Plaintiff IDAS is a Dutch Antilles company with its principal place of business in the United Kingdom.  (Cmpl. ¶ 1.)  IDAS is a wholly owned subsidiary of plaintiff Adestra Minerals, Inc. ("AMI"), a Canadian company with its principal place of business in the United Kingdom. (*Id.* ¶¶ 3, 14.)  Prior to AMI's acquisition of IDAS, plaintiff Pabeco B.V. ("Pabeco") was a shareholder in IDAS.  (*Id.* ¶ 12 & n.2.)  Thereafter, Pabeco "retained a net profits interest" in IDAS.  (*Id.* ¶ 14.)

According to the complaint, in 1995 IDAS procured two licenses for diamond prospecting and mining in the Luanda Norte and Malange regions of Angola.  (*Id.* ¶ 10.)  IDAS then contracted with ENDIAMA and a third party, Twins Limited ("Twins"), to form a joint venture to develop the licensed areas.  (*Id.*)  It is undisputed that ENDIAMA has its principal place of business in Luanda, Angola, and that ENDIAMA is owned and controlled by the Angolan government.  (*See id.* ¶ 4; Def. ENDAMA's P. & A. at 3.)  The parties also agree that Twins is a company formed in the Cook Islands.  (*See, e.g.*, Pls.' Resp. to Def. NOFAR's Mot. to Dismiss ["Pls.' NOFAR Resp."] at 5; Def. ENDIAMA's Reply at 4 n.3.)  Plaintiffs allege that Twins has its principal place of business and "nerve center of operations" in the District of Columbia, and that each of the company's two "principals" maintains a residence or part-time residence there.  (*E.g.*, Pls.' NOFAR Resp. at 5.)

In 1999, IDAS, ENDIAMA, and Twins agreed to terminate their original joint venture agreement.  (Cmpl. ¶ 17.)  They did so because a change in Angolan law set new limits upon the total area of diamond concessions that any single company could hold.  (*Id.*)  Under the new law,

IDAS's original concessions were too large.  (*See id.* ¶¶ 17, 19.)  In anticipation of receiving

new, smaller concessions from the Angolan government, IDAS and ENDIAMA executed a

"Memorandum of Understanding" ("MOU") providing for a new joint venture among IDAS,

ENDIAMA, and Twins.  (*Id.* ¶ 18.)

  After Angola's Government Council of Ministers officially granted IDAS and

ENDIAMA new concessions, the joint venturers executed two contracts formalizing the structure

of their enterprise.  (*Id.* ¶¶ 18, 19.)  In August 2002, they executed a "Heads of Agreement" that

detailed relative shareholdings and a plan for reimbursing shareholder loans.  (*Id.* ¶ 21.)  In

December 2002, the joint venturers executed an agreement in which they "detailed the

composition of the Board of Directors, the management structure of the joint venture company,

the minimum investment to be made by IDAS, and details governing the payment of a signing

bonus to ENDIAMA and the repayment of shareholder loans to IDAS."  (*Id.* ¶ 22.)  The

agreement allegedly specified that IDAS would own 51 percent of the company until all

shareholder loans were repaid, while ENDIAMA would own 38 percent and Twins 11 percent.

(*Id.*)  Consistent with this ownership structure, IDAS would choose three of the five board

members.  (*Id.*)  After capital recoupment, IDAS's ownership would fall to 49 percent, Twins

would own a 13 percent share, ENDIAMA's share would remain unchanged, and IDAS would

maintain three representatives on the board of directors.  (*Id.*)

  Plaintiffs allege that, soon after these agreements were reached, ENDIAMA began

negotiating for changes to the joint venture's structure.  (*Id.* ¶¶ 23–24.)  When ENDIAMA asked

to revise some of the terms of the Heads of Agreement, IDAS agreed.  (*Id.* ¶ 23.)  IDAS did not

agree, however, when ENDIAMA proposed reducing IDAS's ownership from 51 to 43 percent

and limiting IDAS to one representative on the board of directors.  (*Id.* ¶ 24.)

According to plaintiffs, IDAS learned in mid-2004 that ENDIAMA had been negotiating for several months with NOFAR, a Netherlands company, to replace IDAS as ENDIAMA's joint venture partner.  (*Id.* ¶ 25.)  On May 18, 2004, ENDIAMA, NOFAR, and Twins executed a contract to explore and exploit most of the concession area that ENDIAMA and Twins had previously agreed to explore and exploit with IDAS.  (*Id.* ¶ 25; Pls.' Reply to ENDIAMA's Resp. to Pls.' Mot. for Leave to Supp. ["Pls.' Supp. Reply"] Ex. 1 at 0, 30.)  In July 2004, ENDIAMA informed IDAS that ENDIAMA would no longer honor its contractual obligations under the joint venture agreements with IDAS.  (Cmpl. ¶ 26.)

As alleged in the complaint, plaintiffs claim that ENDIAMA's actions "have caused a direct effect in the United States, including a loss of income to the principals in Twins" and "losses to the United States shareholders of AMI."  (*Id.* ¶ 27.)  Plaintiffs seek to hold ENDIAMA liable for breach of contract, breach of duty of good faith, fraudulent misrepresentation, and discrimination between investors and cancellation of licenses in violation of Angolan law, and they accuse NOFAR of tortious interference with contractual relations.  Plaintiffs request compensatory and punitive damages in excess of $529 million.  (*Id.* ¶¶ 60–63.)

## ANALYSIS

### I.    Legal Standard Governing Defendants' Motions to Dismiss

When defendants file motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), plaintiffs bear the burden of establishing subject matter jurisdiction.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  A court may dismiss a complaint for lack of subject matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of

4

facts in support of his claim which would entitle him to relief." *Richardson v. United States*, 193

F.3d 545, 549 (D.C. Cir. 1999) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*,

148 F.3d 1080, 1086 (D.C. Cir. 1998)). In considering the sufficiency of a plaintiff's allegations

for this purpose, a court may consider materials outside the pleadings. *Herbert v. Nat'l Acad. of

Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## II.    This Court Lacks Subject Matter Jurisdiction over Plaintiffs' Claims against ENDIAMA

### A.    Jurisdiction under FSIA

FSIA "establishes a comprehensive framework for determining whether a court in this

country, state or federal, may exercise jurisdiction over a foreign state." *Republic of Argentina v.

Weltover, Inc.*, 504 U.S. 607, 610 (1992). FSIA permits suits in U.S. courts against foreign states

(or their political subdivisions, agencies, or instrumentalities) even when all plaintiffs are

themselves foreign citizens. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 490–91

(1983) (explaining that, if FSIA's substantive standards are satisfied, an action "may be brought

in federal court regardless of the citizenship of the plaintiff"). Foreign states are immune from

suit in U.S. courts, however, "unless one of several statutorily defined exceptions [to sovereign

immunity] applies." *Weltover*, 504 U.S. at 610. Thus, unless one of FSIA's exceptions applies,

claims against foreign states are beyond a U.S. court's subject matter jurisdiction. *Id.*

Foreign defendants challenging a U.S. court's subject matter jurisdiction bear the ultimate

burden of proving immunity. *E.g.*, *Global Index., Inc. v. MKAPA*, 290 F. Supp. 2d 108, 111

(D.D.C. 2003). When, as here, a defendant "challenges . . . the legal sufficiency of the plaintiff's

jurisdictional allegations, then the . . . court should take the plaintiff's factual allegations as true

and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Id.* (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

**B.    The "Expropriation Exception"**

Plaintiffs argue that their allegations meet the requirements of FSIA's expropriation exception:

> (i) [that] rights in property are at issue;  (ii) [that] those rights were taken in violation of international law;  and (iii) [that] the property . . . is [either] present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or . . . owned or operated by an agency of the foreign state engaged in a commercial activity in the United States.

*Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 196 (D.D.C. 2004); *see* 28 U.S.C. § 1605(a)(3) (2006).  Defendants argue that plaintiffs have failed to meet the first and third of these requirements, and the Court agrees.  Moreover, it is premature for plaintiffs to allege a taking "in violation of international law."

**1.    Rights in Property**

Section 1605(a)(3) does not define "rights in property."  *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 100 (8th Cir. 1989).  This Court and others, however, have repeatedly construed the term to include only "tangible rights," not "intangible rights" such as contract rights.  *See, e.g.*, *id.* at 101 ("Some courts have interpreted [§ 1605(a)(3)] to exclude claims involving intangible property, such as contracts."); *Nemariam v. Fed. Democratic Republic of Ethiopia*, 400 F. Supp. 2d 76, 82–83 (D.D.C. 2005) (concluding that FSIA's expropriation exception "is not implicated when intangible property is the object of the dispute").

Here, plaintiffs have repeatedly underscored ENDIAMA's alleged failure to "honor its

6

contractual obligations."  (Cmpl. ¶¶ 26, 30–32; *see id.* ¶ 47 ("ENDIAMA . . . discriminated

against IDAS by terminating its contractual relationship with IDAS . . . .").)  Such a breach of

contract cannot satisfy the expropriation exception's "rights in property" requirement.  *See, e.g.,*

*Peterson*, 332 F. Supp. 2d at 197 ("[T]angible property is 'physical' and does not include

contract rights or the right to receive payments.").

        In the face of such well-established law regarding intangible rights, plaintiffs have

changed their approach and, in their last of three memoranda of law,[1] they argue for the first time

that ENDIAMA deprived them of tangible rights in property by appropriating IDAS's "licenses"

to conduct diamond prospecting and mining.[2]  (*See* Pls.' Supp. Reply at 4.)  The crux of

plaintiffs' argument is that, because IDAS's licenses concerned the use of parcels of land, which

are tangible, the licenses themselves must be tangible.  (*See id.*)  But the two cases plaintiffs cite

in support of their argument are inapposite.  *See Peterson*, 332 F. Supp. 2d at 196–97 (explaining

the rule that rights in property must be tangible and concluding that the plaintiff's expectation

interest in repayment for contributions to a retirement-benefits fund in Saudi Arabia was not a

tangible right); *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 528 F.

---

[1]To permit consideration of plaintiffs' written supplemental response and written
supplemental reply to ENDIAMA's motion, the Court will grant in part plaintiffs' "Motion for
Leave to Supplement Response, Oral Argument, and Limited Jurisdictional Discovery."  As
explained herein, however, the Court will deny the motion insofar as plaintiffs request oral
argument and jurisdictional discovery.

[2]Plaintiffs' original response to ENDIAMA's motion to dismiss makes a passing
reference to "ENDIAMA's taking of their licenses and concessions."  (Pls.' Resp. to Def.
ENDIAMA's Mot. to Dismiss ["Pls.' ENDIAMA Resp."] at 17.)  Nowhere in this response,
however, do plaintiffs argue that IDAS's licenses constituted tangible rights, as opposed to
intangible contract rights.  (*See id.* at 16–18.)  Nor do plaintiffs raise such an argument in their
motion for leave to supplement their initial response.  (*See* Pls.' Mot. for Leave to Supp. ["Pls.'
Supp. Resp."] at 1–4.)

Supp. 1337, 1346–47 (S.D.N.Y. 1982) (explaining that the expropriation exception reaches only tangible property, and that because the plaintiff's "complaint rest[ed] on a breach of contract claim . . . its claim [was] not within the purview of [the expropriation exception]"), *aff'd*, 727 F.2d 274 (2d Cir. 1984).

The Court is aware of no case in any jurisdiction that addresses whether a license constitutes tangible property for purposes of FSIA's expropriation exception.[3]  In analogous contexts, however, licenses are regularly treated as intangible property.  *See, e.g.*, *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (describing, as part of a Fifth Amendment analysis, "government issued permits and licences" such as grazing and fishing permits as "intangible property"); 73 C.J.S. § 15 (2004) (classifying property rights in the practice of a profession as "intangible"); *see also Atl. Tele-Network*, *Inc. v. Inter-Am. Dev. Bank*, 251 F. Supp. 2d 126, 128 (D.D.C. 2003) (describing the plaintiff's "exclusive license from the government of Guyana to operate [a telecommunications] system" as a "contractual right").  The definition of "license" supports such treatment.  *See Black's Law Dictionary* 938 (8th ed. 2004) (defining a license as "*a permission*" or "*an authority*" to do an otherwise unlawful act on the licensor's land (emphasis added)).

Accordingly, the Court rejects plaintiffs' belated attempt to recast their allegation that

---

[3]At least one other case in this circuit has presented such a claim.  *See Marra v. Papandreou*, 216 F.3d 1119, 1124 n.4 (D.C. Cir. 2000) (noting that, in addition to invoking FSIA's commercial activity exception, "the suit [against the Greek government for revoking the plaintiff's casino license] also include[d] an expropriation count").  The facts of *Marra*, however, did not require discussion of the expropriation claim.  *See id.* ("Since Marra's expropriation claim is wholly derivative of the Greek government's alleged breach of the Flisvos license, it certainly presents a dispute 'concerning a license' that is covered by the forum-selection provision [and so must be enforced in Greece by the terms of the contract at issue].").

ENDIAMA did not honor its contractual obligations into a claim that ENDIAMA deprived IDAS of tangible rights. Even if ENDIAMA did deprive IDAS of its licenses to conduct diamond prospecting and mining, ENDIAMA did not take "rights in property" within the meaning of § 1605(a)(3).

### 2.    Takings in Violation of International Law

Also, it is premature for the Court to consider whether ENDIAMA took IDAS's licenses in violation of international law. "[A] claimant cannot complain that a 'taking' or other economic injury has not been fairly compensated, and hence violates international law[,] unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998). Here, plaintiffs allege they "were in no way compensated for ENDIAMA's taking of their licenses and concessions," without alleging they have ever pursued remedies in Angola.[4] (Pls.' Resp. to Def. ENDIAMA's Mot. to Dismiss ["Pls.' ENDIAMA Resp."] at 17.) For this additional reason, FSIA's expropriation exception does not confer subject matter jurisdiction over the claims against ENDIAMA.

### 3.    Commercial Activity in the United States

Finally, plaintiffs cannot satisfy the third prong of the expropriation exception because they have not alleged facts sufficient to show ENDIAMA "is engaged in a commercial activity in

---

[4]Moreover, plaintiffs do not allege that the remedies available in Angola are clearly inadequate, or that ENDIAMA "firmly denies responsibility" for taking plaintiffs' licenses. *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998) (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 713 cmt. f).

the United States."  28 U.S.C. § 1605(a)(3).[5]

 To support their contention that ENDIAMA is engaged in at least one commercial activity in the United States, plaintiffs allege that "ENDIAMA has a long history of commercial dealings with U.S. based entities."  (Pls.' ENDIAMA Resp. at 18.)  For example, plaintiffs emphasize that ENDIAMA has entered into multiple contracts with Twins - - a company that plaintiffs characterize as "U.S. based" despite its incorporation in the Cook Islands.  (Def. ENDIAMA's P. & A. at 4 n.3.)  Similarly, plaintiffs highlight two agreements for the purchase, export, and marketing of rough diamonds that ENDIAMA (or its subsidiary) formed with a U.S. corporation - - Lazare Kaplan International, Inc. ("LKI").  (Pls.' ENDIAMA Resp. at 18–19.)  One of the LKI agreements spanned five years, and the other allegedly "secured the Angolan export of [rough diamonds worth] over $110 million dollars."  (*Id.* at 19.)

 As ENDIAMA correctly observes, however, none of plaintiffs' pleadings or supporting exhibits alleges that ENDIAMA ever performed any act within the United States.[6]  (Def. ENDIAMA's Reply at 11.)  For example, plaintiffs do not allege that any representative of ENDIAMA ever transacted business in the United States with Twins; instead, plaintiffs have

_____

 [5]Defendants do not contest that ENDIAMA is an "agency or instrumentality" of Angola or that ENDIAMA "own[s] or operate[s]" IDAS's former licenses.  28 U.S.C. § 1605(a)(3) (2006).  Plaintiffs do not, and could not, argue that the property allegedly taken from IDAS is "present in the United States in connection with a commercial activity carried on in the United States" by Angola.  *Id.*

 [6]Plaintiffs do not even allege that ENDIAMA took actions from abroad aimed at attracting business from U.S. entities.  *Cf., e.g.*, *Altmann v. Republic of Austria.*, 142 F. Supp. 2d 1187, 1204–05 (C.D. Cal. 2001) (concluding that an Austrian museum engaged in "commercial activity in the United States" when it published a guidebook in English available for purchase to U.S. citizens, advertised in the United States, lent a painting to the United States, and received visits by thousands of U.S. citizens each year), *aff'd*, 327 F.3d 1246 (9th Cir. 2003).

furnished an affidavit in which a former chief operating officer *of AMI* states that on two

occasions he and another employee *of AMI* traveled to the District of Columbia to meet with

Twins.  (*See* Pls.' ENDIAMA Resp. Ex. 8 ["Pryor Decl."] ¶ 10.)  Similarly, plaintiffs do not

identify any actions ENDIAMA took in the United States regarding the LKI contracts.  The

documents plaintiffs have offered regarding these agreements show, at most, that LKI has made

efforts to broaden "its purchasing capabilities throughout Africa," that it has procured "a license

to purchase rough diamonds from local Angolan miners and export such rough diamonds," and

that it has five buying offices in Angola.  (*See* Def. ENDIAMA's Reply at 11 (quoting from the

LKI contracts).)

Thus, even accepting all of plaintiffs' allegations as true, this Court cannot exercise

subject matter jurisdiction over the claims against ENDIAMA based on FSIA's expropriation

exception, because plaintiffs fail to satisfy even one of the exception's three requirements.

### C.    The "Commercial Activity Exception"

Plaintiffs also argue that this Court may exercise subject matter jurisdiction over their

claims against ENDIAMA pursuant to FSIA's commercial activity exception.  Specifically,

plaintiffs invoke the third clause of 28 U.S.C. § 1605(a)(2), thus requiring the Court to determine

whether plaintiffs' suit is "(1) 'based . . . upon an act outside the territory of the United States';

(2) that was taken 'in connection with a commercial activity' of [the defendant] outside this

country; and (3) that 'cause[d] a direct effect in the United States.'"  *Weltover*, 504 U.S. at 611

(first and third alterations in original) (quoting 28 U.S.C. § 1605(a)(2)).  Because defendants

concede the first two requirements, the only issue before the Court is whether ENDIAMA's acts

"cause[d] a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

As the Supreme Court clarified in *Weltover*, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'"  504 U.S. at 618 (alteration in original) (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991)).  Although the effect need not be substantial or foreseeable, it must be more than "purely trivial."  *Id.*

Here, plaintiffs claim a direct effect based on two allegations.  First, they allege that ENDIAMA's acts caused a loss of income to Twins and its "principals" - - Robert Cabelly and Antonio dos Santos Franca (known as General Ndalu).  (*See* Cmpl. ¶ 27; Pls.' Supp. Reply at 2.)  Second, they allege that ENDIAMA's acts have caused "losses to the United States shareholders of AMI."  (Cmpl. ¶ 27.)  Even accepting these allegations as true, plaintiffs have failed to establish that ENDIAMA's acts had any direct effect in the United States.

### 1.    Losses to Nonplaintiffs

Plaintiffs adopt a novel approach to proving that ENDIAMA's acts caused a direct effect in the United States.  Rather than focusing on any losses to themselves, plaintiffs attempt to satisfy the direct effect requirement by alleging losses to nonparties - - Twins and AMI's U.S. shareholders.  Plaintiffs' reliance on alleged losses to Twins is particularly curious, given that plaintiffs themselves admit Twins is aligned with the defendants.[7]  (*See* Pls.' Supp. Reply at 3 ("[I]f Twins [were] a proper party, it would be as a co-defendant, not a plaintiff.").)

ENDIAMA argues that allegations of losses to nonparties cannot establish a direct effect.

---

[7]According to plaintiffs, Twins would be a defendant because, together with ENDIAMA, it abandoned the joint venture with IDAS to participate in the new joint venture with NOFAR. (Pls.' Supp. Reply at 3.)  In light of this fact, plaintiffs' allegation that Twins suffered losses from ENDIAMA's breach of contract is highly dubious.  In deciding the question of subject matter jurisdiction, however, the Court will treat plaintiffs' allegation as true.  *See Global Index, Inc. v. MKAPA*, 290 F. Supp. 2d 108, 111 (D.D.C. 2003).

(Def. ENDIAMA's P. & A. at 5.)  At least one case in this district, *TermoRio S.A. E.S.P. v. Electrificadora del Atlantico S.A.*, 421 F. Supp. 2d 87 (D.D.C. 2006), lends support to ENDIAMA's contention.  In *TermoRio*, two plaintiffs (TermoRio and LeaseCo) sued the Republic of Colombia and a corporation owned by the Colombian government for breach of contract and to enforce an arbitration award.  *Id.* at 88–89.  Seeking to establish subject matter jurisdiction over their breach of contract claim, the plaintiffs alleged that the defendants' acts had caused a loss to LeaseCo.  *Id.* at 95.  In concluding that the plaintiffs had failed to establish subject matter jurisdiction under the commercial activity exception, the Court noted: "LeaseCo lacks standing and is no longer a plaintiff in this proceeding, and accordingly any proposed effect on LeaseCo is irrelevant."  *Id.*

Nonetheless, although there appears to be no case directly on point, plaintiffs are correct that the plain language of FSIA does not limit direct effects to effects suffered by plaintiffs.  (*See* Pls.' Supp. Reply at 3.)  At least the Tenth Circuit has considered the possibility of finding a direct effect based on losses to nonparties.  *See United World Trade, Inc. v. Mangyshlakneft Oil Prod. Assoc.*, 33 F.3d 1232, 1236–38 (10th Cir. 1994) (rejecting the plaintiff's argument that lost commissions to a U.S. bank resulting from the defendant's breach of a contract that required payments to the plaintiff in U.S. dollars constituted a direct effect, not because the U.S. bank was not a plaintiff, but because the money transfers on which it would have earned commissions were not required under the breached contract).

The Court, however, does not need to decide whether FSIA could ever confer subject matter jurisdiction based on alleged losses to nonparties, because it is clear for other reasons that the losses alleged here were not direct effects of acts by ENDIAMA.

### 2.    Performance "Supposed to" Occur in the United States

Plaintiffs contend they have established a direct effect in the United States because, in breaching the joint venture agreement, ENDIAMA deprived Twins of payments that Twins was supposed to receive in U.S. bank accounts.  More specifically, plaintiffs allege that Twins lost payments for consulting services it would have provided, and related expenses it would have incurred, to promote IDAS's joint venture.[8]  (*See* Pls.' ENDIAMA Resp. at 15.)  Plaintiffs do not allege that any of the agreements among ENDIAMA, IDAS, and Twins expressly provided that Twins would receive such payments in a U.S. bank account.  Instead, plaintiffs urge the Court to find a direct effect in the United States based on allegations that IDAS made three payments to Twins executive Cabelly into U.S. bank accounts that Cabelly had designated in letters to IDAS or AMI.[9]  (*See* Pryor Decl. at ¶¶ 8–9; Pls.' ENDIAMA Resp. Ex. 7 at 1, 6 (directing AMI to transfer travel-expense reimbursements to a First Union Bank account); *id.* at 2 (designating a Nations Bank account number for payment of a consulting fee); *id.* at 13–15; Pls.' Supp. Reply at 2.)

### a.    Failure to Allege an Immediate Consequence of ENDIAMA's Activity

A direct effect must follow "as an *immediate consequence* of *the defendant's* [not the

---

[8]Plaintiffs also suggest that the Court could find a direct effect based on lost profit distributions to Twins.  (*See* Pls.' ENDIAMA Resp. at 15.)  Because plaintiffs focus their arguments on the lost consulting and expense payments, however, the Court will not separately address the allegation of lost profit distributions.  The Court's reasoning about lost consulting and expense payments applies with equal, if not greater, force to any claim of lost profit distributions to Twins.

[9]For the sake of simplicity, the Court will refer to payments by IDAS's parent company, AMI, as payments by IDAS.

plaintiff's] . . . activity." *Weltover*, 504 U.S. at 618 (emphasis added) (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991)); *see Millicom*, 995 F. Supp. at 22 ("A contract claim based upon a breach constitutes a 'direct effect' if *the foreign state* breached obligations that *the foreign state itself* was required to perform in the United States."). Here, plaintiffs nowhere allege that *ENDIAMA* was obligated under the joint venture agreements to make consulting and expense payments to Twins (let alone to make such payments in the United States). IDAS's own failure to make payments cannot have been an immediate consequence of ENDIAMA's activity. *See id.*

Plaintiffs attempt to evade this obstacle by alleging, for the first time in their supplemental response, that IDAS made payments to Cabelly on behalf of both IDAS and ENDIAMA. (*See* Pls.' Mot. for Leave to Supp. ["Pls.' Supp. Resp."] at 2 ("ENDIAMA ignores the fact that these payments were made by IDAS on its own behalf and on behalf of ENDIAMA because the parties agreed that IDAS would make these payments for itself and ENDIAMA."); *see also* Pls.' Supp. Reply at 2 ("Twins was reimbursed for its expenses by IDAS because IDAS was contractual[ly] obligated to carry the interests of Twins and ENDIAMA, which was an obligation imposed by ENDIAMA.").)[10] This allegation does not, however, cure plaintiffs'

---

[10]This allegation is suspect, not only because plaintiffs failed to raise it in their complaint and initial response to ENDIAMA, but because plaintiffs have introduced no substantiating evidence - - neither the joint venture agreements themselves, nor any sworn declaration regarding relevant content of those agreements. (The declaration of former AMI executive Bernard Pryor, for example, is silent as to what, if anything, the agreements provided about IDAS's consulting services.) In fact, the only evidence plaintiffs have introduced strongly suggests that the payments Cabelly received in designated U.S. bank accounts were for consulting services rendered *to IDAS* under agreements to which ENDIAMA was not a party. (*See, e.g.*, Pryor Decl. at ¶ 9 ("Twins also received compensation in Washington, D.C. for work related to its efforts *to assist IDAS* under the 1995 Agreement." (emphasis added)); *id.* at ¶ 9 ("As of the date of ENDIAMA's repudiation of the 2002-2003 Agreements, Twins *had not advised IDAS* that future

failure to allege that "[*ENDIAMA*] breached obligations that [*ENDIAMA*] *itself* was required to perform in the United States."  *Millicom*, 995 F. Supp. at 22.

### b.    Failure to Allege a Consistent, Longstanding History of Payment in the United States

Moreover, even assuming *arguendo* that plaintiffs' allegations could be construed as allegations that ENDIAMA breached its own performance obligations, the Court would still find that IDAS's payments to Cabelly's accounts were insufficient to establish a direct effect.

Prior to *Weltover*, the D.C. Circuit required plaintiffs attempting to establish direct effects in the United States based on nonpayments to U.S. bank accounts to allege the existence of an express agreement to make payments to a location within the United States.  *See, e.g.*, *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1151, 1514–15 (D.C. Cir. 1988) (rejecting the plaintiff's theory that Saudi Arabia's failure to pay him for work performed in Saudi Arabia constituted a direct effect because "[n]o allegation [was] made that the [employment] contract . . . required that the money be forwarded to a specific address in the United States, or even to a particular city").  This requirement was borne out of an understanding that, to be "direct" within the

---

payments, whether for expenses, services rendered, or profit distribution were not to be made to Twins in Washington D.C., as prior payments had been made."); Pls.' ENDIAMA Resp. Ex. 7 at 1, 6 (designating a First Union Bank account number for reimbursement of travel expenses in a letter *to AMI*); *id.* Ex. 5 at 2 (specifying that payment would "complete[] *IDAS's* commitment" and enable Cabelly "to assist *IDAS*" (emphasis added)).)  An allegation that IDAS failed to make payments to Twins under side contracts to which ENDIAMA was not a party would be insufficient to satisfy the direct effect requirement.  *Cf. Millicom*, 995 F. Supp. at 21–22 (rejecting the plaintiffs' theory that Costa Rica's breach of contract caused a direct effect in the United States simply because, in reliance on the contract, the plaintiffs had incurred "separate contractual obligations" by borrowing money that had to be repaid to a New York bank account).  Nonetheless, the Court must credit plaintiffs' allegation as true and will limit its ruling to whether, as a matter of law, ENDIAMA enjoys sovereign immunity under FSIA.  *See Global Index*, 290 F. Supp. 2d at 111.

16

meaning of the commercial activity exception, an "effect in the United States" needed to be

"substantial" and "foreseeable." *See id.* at 1515 n.2 ("[W]e think the terms of such a contract

would, at the very least, have to specify a particular location in the United States, even perhaps

the particular bank through which payment was to be made, before the breach could be said to

cause a substantial, direct, and foreseeable effect in the United States.").

In post-*Weltover* cases, the D.C. Circuit, unlike other circuits,[11] has not imposed a *per se*

rule requiring plaintiffs to allege an express agreement to make payments in the United States.

*Global Index*, 290 F. Supp. 2d at 113; *see, e.g.*, *Goodman Holdings v. Rafidain Bank*, 26 F.3d

1143, 1146–47 (D.C. Cir. 1994) (stopping short of endorsing such a rule, but distinguishing

*Weltover* on the ground that the defendant in *Weltover* had expressly agreed to make payments in

New York if the plaintiffs so chose); *see id.* at 1147 (Wald, J., concurring) ("I write separately to

emphasize that, for an act to have a 'direct effect' in the United States, there is no prerequisite

that the United States be contractually designated as the place of performance."). *But see*

*TermoRio*, 421 F. Supp. 2d at 95–96 ("[T]he direct effect test is interpreted to require a clause in

a contract mandating the fulfillment of contractual obligations in the United States.") (alteration

in original) (quoting *Atl. Tele-Network*, 251 F. Supp. 2d at 134 (emphasis omitted)); *Atl. Tele-*

---

[11]Courts in other jurisdictions apply a "legally significant act" test that requires a plaintiff to allege the existence of a contract provision expressly requiring payment in the United States (or, at a minimum, a contract provision authorizing the designation of a specific place of payment at some later date). *See Global Index*, 290 F. Supp. 2d at 112 ("The Second Circuit's 'legally significant act' test requires express provision of payment in the U.S." (footnote omitted)); *Hanil Bank v. PT. Bank Negara Indon.*, 148 F.3d 127, 132–33 (2d Cir. 1998) (recognizing a direct effect when, "[a]lthough the letter of credit did not itself specify New York as the place of payment, it authorized the negotiating bank to designate the place of payment"); *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Assoc.*, 33 F.3d 1232, 1239 (10th Cir. 1994) (applying the Second Circuit's "legally significant act" test).

*Network*, 251 F. Supp. 2d at 134 (citing additional cases, including *Goodman Holdings*, in

support of an "express designation" requirement).  Instead, "the D.C. Circuit follows the same,

more general approach set forth in *Weltover*.  There is no direct effect unless payment was

'supposed' to have been made in the United States."  *Global Index*, 290 F. Supp. 2d at 113.

        "By following the *Weltover* 'supposed to' approach, the cases in this circuit have left

open the possibility that a court could find a 'direct effect' based upon a non-express agreement

to pay in the United States."  *Id.* at 114.  "As a factual matter, however, in almost every case, in

this circuit and others, involving the direct effect exception, the existence or absence of an

expressly designated place of payment has been decisive."  *Id.*  Therefore, absent an expressly

designated place of payment, the only possible way of establishing a direct effect by nonpayment

"that courts of this circuit have even considered" is a "*consistent* history of payment in the

[United States]."  *Id.* at 114 n.8 (emphasis added); *see, e.g.*, *Goodman Holdings*, 26 F.3d at 1147

(Wald, J., concurring) ("Moreover, even absent a contractual provision mandating the

involvement of U.S. banks, if the *longstanding consistent customary practice* between [the

defendant] and [the plaintiff] had been for [the defendant] to pay [the plaintiff] from its New

York accounts, the breach of the letters of credit might well have had a direct and immediate

consequence in the United States." (emphasis added)); *see Global Index*, 290 F. Supp. 2d at 115;

*see also Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30,

37 (D.D.C. 2002) ("[P]laintiffs are not entitled to discovery on the issue of 'direct effect,' as

plaintiffs present no facts suggesting that Brazil has recently made payments in the United

States . . . .").

        Here, there is no allegation that ENDIAMA expressly agreed that Twins should receive

payments in U.S. bank accounts.  Even interpreting plaintiffs' pleadings liberally, plaintiffs
appear to contend that the three payments IDAS made to U.S. bank accounts designated by
Cabelly constitute evidence of ENDIAMA's implicit (as opposed to contractual) agreement that
Twins would receive payments in the United States.  (*See* Pls.' Supp. Resp. at 2 ("ENDIAMA
ignores the fact that these payments were made by IDAS on its own behalf and on behalf of
ENDIAMA because the parties agreed that IDAS would make payments for itself and
ENDIAMA.").)  On the facts presented by plaintiffs, however, even if the three payments IDAS
made to Twins could somehow be ascribed to ENDIAMA, the Court is unwilling "to be the first
to find direct effects based on an implied or constructive agreement" to make payments in the
United States.  *Global Index*, 290 F. Supp. at 114–15.

     According to plaintiffs, IDAS made at most three payments to U.S. bank accounts over
the nine-year duration of the joint venture relationship involving IDAS, ENDIAMA, and Twins.
(*See* Cmpl. ¶¶ 10, 26 (alleging that the original joint venture was formed in 1995, and that
ENDIAMA repudiated the joint venture agreements in July 2004).)  The time between the first
payment and the second two payments was more than five years.  (*See* Pls.' ENDIAMA Resp.
Ex. 7 at 1, 6 (showing payments in December and November 2003); *id.* Ex. 6 at 1
(acknowledging payment of funds to Cabelly in 1998).)  Not only do plaintiffs fail to allege the
payments were made pursuant to a regular schedule, but plaintiffs have submitted evidence that
clearly shows Cabelly and IDAS arranged the payments on an *ad hoc* basis.  (*See id.* Ex. 7 at 1;
*id.* Ex. 5 at 1–2.)  Thus, although it may theoretically be possible to establish a direct effect in the
United States by alleging a consistent, longstanding history of payments to U.S. bank accounts,
plaintiffs have alleged no such history here.

In sum, plaintiffs have failed to satisfy the direct effect requirement on the theory that ENDIAMA was supposed to perform contractual obligations in the United States.

### 3.    Losses to a U.S. Company or U.S. Shareholders

In the alternative, plaintiffs claim to have established a direct effect in the United States by alleging losses to a U.S. entity (Twins) and individual U.S. citizens (the AMI shareholders). (Pls.' ENDIAMA Resp. at 14–15.)

Several opinions from this district explain that allegations of financial loss to a U.S. person or company cannot, taken alone, establish "a direct effect in the United States" within the meaning of 28 U.S.C. § 1605(a)(2).  *See, e.g.*, *Global Index*, 290 F. Supp. 2d at 115 ("The fact that a U.S. citizen or entity suffers a loss does not suffice to prove a direct effect in the United States."); *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 81 (D.D.C. 2003) ("A financial loss in the United States, when all the acts giving rise to the claim occurred outside this country, is insufficient to show the 'direct effect in the United States that FSIA requires."); *Croesus*, 212 F. Supp. 2d at 37 n.5 ("Plaintiffs have not identified any precedent in this Circuit supporting . . . a position [that a direct effect occurred merely because U.S. entities allegedly suffered losses], and the Court sees no basis for extending the meaning of a 'direct effect' that far.").

The Court has discovered a single case, *Virtual Defense and Development International v. Republic of Moldova*, 133 F. Supp. 2d 1 (D.D.C. 1999), in which a direct effect in the United States was found based solely on alleged losses to a U.S. corporation.  In *Virtual Defense*, the plaintiff alleged it had a contract with the defendant under which it "would receive a commission of fifteen percent upon successfully negotiating the sale of . . . MiG-9 planes."  *Id.* at 2.

Negotiations took place in Moldova, and the plaintiff did not allege that the defendant had expressly agreed to make payments to U.S. bank accounts.  *See id.* at 6–7.  Nevertheless, the Court concluded that, "[b]ecause [the plaintiff was] solely a United States corporation and the alleged contract contemplated that [the plaintiff] would receive compensation from the profits of the sale of the MiG-29 planes, . . . the alleged breach of contract had a direct effect in the United States."  *Id.* at 7.

To the extent *Virtual Defense* cannot be reconciled with the more recent District of Columbia cases that uniformly hold that losses to a U.S. citizen or entity cannot, taken alone, constitute direct effects, *Virtual Defense* is unpersuasive.  The only D.C. Circuit authority *Virtual Defense* cites for its conclusion that such losses can constitute direct effects is *Goodman Holdings*.  But even interpreting *Goodman Holdings* expansively, that case merely permits the possibility that nonpayments to a U.S. corporation might constitute direct effects in the United States where there was a consistent, longstanding history of payment to U.S. bank accounts.  *See* 26 F.3d at 1147 (Wald, J., concurring).  Moreover, because Congress used the phrase "*direct effect*" in place of "effect," this Court is unwilling to adopt a rule that "would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state."  *United World Trade*, 33 F.3d at 1239.

In any event, the present case is factually distinguishable from *Virtual Defense*.  For one, in *Virtual Defense* the alleged losses were losses to the plaintiff.  Here, the alleged losses were suffered by nonparties.  In addition, it was significant to the decision in *Virtual Defense* that the injured plaintiff was "*solely* a United States corporation."  133 F. Supp. 2d at 7 (emphasis

added).  Here, by contrast, if Twins could generously be characterized as a "U.S. corporation" at

all - - which the Court need not decide - - Twins is not solely a U.S. corporation because it was

incorporated in the Cook Islands.  (*E.g.*, Pls.' Supp. Reply at 2.)

Thus, whether under a theory that performance was supposed to occur in the United

States, or under the theory that a U.S. company and U.S. citizens suffered losses, the commercial

activity exception does not establish subject matter jurisdiction over plaintiffs' claims against

ENDIAMA.[12]

### D.     Jurisdictional Discovery

Plaintiffs contend that, if they have so far failed to establish this Court's subject matter

jurisdiction over their claims against ENDIAMA, the Court should at least permit them to

conduct limited jurisdictional discovery.  (Pls.' ENDIAMA Resp. at 19–20; Pls.' Supp. Resp. at

3; Pls. Supp. Reply at 5.)  Jurisdictional discovery is not warranted when plaintiffs' allegations,

even if supplemented or verified, would remain insufficient to establish a FSIA exception.  *See,*

*e.g.*, *Goodman Holdings*, 26 F.3d at 1147 ("Under the circumstances, we do not see what facts

additional discovery could produce that would affect our jurisdictional analysis above and

therefore conclude the district court did not abuse its discretion in dismissing the action when it

did."); *Crist v. Republic of Turkey*, 995 F. Supp. 5, 12–13 (D.D.C. 1998) (citing cases and

denying jurisdictional discovery).  Moreover, "the discretion of a district court to allow

---

[12]In concluding that plaintiffs have failed to establish the Court's subject matter
jurisdiction over the claims against ENDIAMA, the Court has not relied on the declaration of
Manuel Arnaldo de Sousa Calado, as to which plaintiffs have raised several objections.  (*See*
Pls.' ENDIAMA Resp. at 4–10.)  Accordingly, the Court will deny as moot ENDIAMA's
"Motion to File Declaration," in which they ask for leave to file de Sousa Calado's amended
declaration.

jurisdictional discovery in FSIA cases is limited to those instances where the facts sought are

peculiarly within the knowledge of the party against whom discovery is sought." *Id.* at 12.

Here, plaintiffs have not alleged facts that, if supplemented or verified, could establish

either the expropriation or the commercial activity exception.  In addition, perhaps the strongest

evidence they could provide for the commercial activity exception - - evidence of the joint

venture agreements among IDAS, ENDIAMA, and Twins - - is not "peculiarly within the

knowledge of" ENDIAMA.  *Id.*  Under these circumstances, awarding plaintiffs even limited

jurisdictional discovery would "frustrate the significance and benefit of [ENDIAMA's]

entitlement to immunity from suit." *Id.* (quoting *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668,

671 (D.C. Cir. 1996)).

## III.  This Court Lacks Subject Matter Jurisdiction over Plaintiffs' Claims against NOFAR

Plaintiffs initially alleged this Court had subject matter jurisdiction over their claims

against NOFAR based on diversity of citizenship.  (*See* Cmpl. ¶ 9 ("Jurisdiction and venue for

all other Defendants [excluding ENDIAMA] are founded on 28 U.S.C. § 1332(a)(2) and 1391(b)

& (d).").)  As NOFAR has correctly argued, diversity cannot be the basis for a court's subject

matter jurisdiction when there are foreign corporations on both sides.  *See Saadeh v. Farouki*,

107 F.3d 52, 61 (D.C. Cir. 1997) ("We . . . conclude that the 1988 amendment to § 1332 did not

confer diversity jurisdiction over a lawsuit between an alien on one side, and an alien and a

citizen on the other side, regardless of the residence status of the aliens.").

Perhaps realizing, with the benefit of NOFAR's motion to dismiss, that it would be

impossible to establish subject matter jurisdiction based on diversity of citizenship, plaintiffs'

response to NOFAR's motion advances a new argument.  No longer claiming diversity jurisdiction, plaintiffs instead now argue that the Court has supplemental subject matter jurisdiction incident to its alleged federal question jurisdiction over the claims against ENDIAMA.  (*See* Pls.' NOFAR Resp. at 2–4.)  For the reasons already explained, the Court lacks subject matter jurisdiction over the claims against ENDIAMA.  Accordingly, the Court lacks supplemental subject matter jurisdiction over the claims against NOFAR.  *See* 28 U.S.C. § 1367(a) (2006).

Because the Court lacks subject matter jurisdiction over the claims against NOFAR, there is no need to consider whether the Court has personal jurisdiction over NOFAR.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 587 (1999) (holding that, although courts may address a plaintiff's challenges to subject matter jurisdiction and personal jurisdiction in either order, "in most instances subject-matter jurisdiction will involve no arduous inquiry" and courts should decide that issue first).  Moreover, because the Court cannot conceive what additional facts would create subject matter jurisdiction, there is no need to conduct jurisdictional discovery.  *See Goodman Holdings*, 26 F.3d at 1147.

## CONCLUSION

For the foregoing reasons, this Court lacks subject matter jurisdiction over plaintiffs' claims.  Because plaintiffs have not presented allegations that, even if verified, would establish subject matter jurisdiction, jurisdictional discovery is unwarranted.  These conclusions obviate the need to consider whether the Court has personal jurisdiction over NOFAR.  The Court will

grant defendants' motions to dismiss, deny plaintiffs' request to conduct jurisdictional

discovery, and dismiss this case for lack of subject matter jurisdiction.


$$\underline{\hspace{3cm} \text{s/} \hspace{3cm}}$$
ELLEN SEGAL HUVELLE
United States District Judge

Date: October 26, 2006